**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **CASSANDRA ALEXANDER** and **EDD ALEXANDER,** | **AMENDED COMPLAINT** |
| Plaintiffs, | |
| -against- | Dkt. No. 21-CV-5816 |
| **THE CITY OF NEW YORK, SGT. DAMON MARTIN; SGT. JAMES PRIORE; OFFICER MANNY SHARMA;** and **OFFICER DOES 1–5,** | |
| Defendants. | |

Plaintiffs Cassandra and Edd Alexander, by their attorneys, Rickner PLLC, complaining of the Defendants, allege, upon information, belief, and personal knowledge:

### NATURE OF THE CASE

1.  This is a civil rights action brought against the City of New York and current and former members of the New York City Police Department ("NYPD"), who violated Plaintiffs' rights under the Constitution of the United States and the Constitution of the State of New York by unlawfully entering Plaintiffs' home without a warrant, in the face of repeated denials of consent to enter, proceeded to arrest them without probable cause, and illegally searched their home and removed their personal effects under the guise of a false eviction of Plaintiff Cassandra Alexander's adult daughter.

2.  The officers went on to fabricate evidence against the Plaintiffs in an effort to cover up their wrongdoing, overdetaining Plaintiffs at a local precinct while securing a search warrant for the home which they had already illegally entered. While the multiple charges against Plaintiffs

were eventually dismissed, they were unnecessarily dragged through the court system for months as a result of these unlawful acts.

3. A subsequent Civilian Complaint Review Board ("CCRB") complaint made by Plaintiffs against the Sergeant who was leading the unconstitutional entrance into their home, Defendant Damon Martin, resulted in a recommendation of "retire"—a consequence used only in limited circumstances where an officer has repeatedly flaunted his duties and engaged in repeated constitutional violations or violations of department procedures. He left the force on or about June 26, 2020, just days after the CCRB determination was made.

4. The City of New York ("City") and the New York City Police Department ("NYPD") knew for years that Martin was violating the rights of civilians, but did nothing to quell his unlawful behavior. Instead, Martin, along with his co-defendant Sgt. Priore, received promotions in the midst of numerous complaints against them.

5. The unlawful entry into Plaintiffs' home was just one of many instances of flagrant fourth amendment violations by NYPD officers—instances where the police entered a home without consent, searched it, and in some cases arrested or unlawfully detained those inside, all without a warrant. The City's failure to properly train, supervise, and discipline its officers regarding the Fourth Amendment's protections amount to a pattern and practice of unconstitutional conduct by the City, and demonstrates the NYPD's deliberate indifference to the constitutional rights of Plaintiffs, and all those they are charged to protect.

**JURISDICTION, VENUE, JURY DEMAND**

6. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States. This court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3) and (4) because Plaintiffs seek redress of violations of their rights guaranteed under the United States Constitution.

7.   Venue is properly laid in the Eastern District of New York pursuant to 28 U.S.C. 1391(b), because a substantial parts of the events or omissions giving rise to the claims alleged herein occurred in the Eastern District of New York.

8.   Plaintiffs demand a jury trial for all claims.

## PARTIES

9.   Plaintiff Cassandra Alexander (hereinafter "Cassandra") is, and was at all times relevant to this action, a resident of Kings County in the State of New York.[1]

10.   Plaintiff Edd Alexander (hereinafter "Edd") is, and was at all times relevant to this action, a resident of Kings County in the State of New York.

11.   Defendant the City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department that acts as its agent in the area of law enforcement and for which it is ultimately responsible. It is the municipal entity responsible for the City's police department, and thus is liable for the unconstitutional patterns and practices promulgated by the NYPD.

12.   Now-retired Defendant Sergeant Damon Martin (Shield No. 4173) (hereinafter "Martin") was at all relevant times described herein an NYPD officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York state law, and acting in the course and scope of his duties. He is sued in his individual capacity for acts and omissions committed under color of law.

---

[1] At the time of the incident, Plaintiffs were not yet married, and Cassandra's surname was Miller.

13. Defendant Sergeant James Priore (Shield No. 4761, former Shield No. 2280) (hereinafter "Priore") was at all relevant times described herein an NYPD officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York state law, and acting in the course and scope of his duties. He is sued in his individual capacity for acts and omissions committed under color of law.

14. Defendant Police Officer Manny Sharma (Shield No. 31876) (hereinafter "Sharma") was at all relevant times described herein an NYPD officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York state law, and acting in the course and scope of his duties. He is sued in his individual capacity for acts and omissions committed under color of law.

15. Defendant Officer Does #1–5 (Shield Nos. Unknown) (hereinafter "Doe Defendants") was at all relevant times described herein NYPD officers employed by the City of New York. At all relevant times described herein, the Doe Defendants were acting under color of New York state law, and acting in the course and scope of their duties attendant to that employment. They are sued in their individual capacity for acts and omissions committed under color of law.

16. The true name and shield numbers of the Doe Defendants are not currently known to the Plaintiffs. However, each Doe Defendant is an employee or agent of the NYPD. Accordingly, each is entitled to representation in this action by the New York City Law Department ("Law Department") upon request, pursuant to New York State General Municipal Law§ 50-k. The Law Department, then, is hereby put on notice (a) that Plaintiffs intend to name said officers as defendants in an amended pleading once the true name and shield numbers are known; and (b) that the Law Department should immediately begin preparing their defense in this action.

17. Collectively, Sgt. Martin, Sgt. Priore, Officer Sharma, and the Doe Defendants are referred to as the "Individual Defendants."

18. At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

19. At all relevant times, the Individual Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## THE VIOLATION OF PLAINTIFFS' CIVIL RIGHTS

### *The Unlawful Entry Into Plaintiffs' Apartment*

20. On February 5, 2019, sometime after 9:00 p.m., Plaintiff Edd Alexander was lawfully inside Cassandra's residence in Brooklyn when Cassandra's adult daughter, Octavia Miller-Griffith ("Miller-Griffith"), came to the apartment through an unlocked front door, unannounced and without permission. She confronted Edd and told him that she was there to things that she left behind when she moved out of the apartment three to four months prior.

21. While Miller-Griffith began going through the Cassandra's dresser, Edd called Cassandra to tell her about Miller-Griffith's presence in the home, to which Cassandra responded that she did not want her daughter in her apartment. Edd relayed this message to Miller-Griffith, closed the dresser drawer in which she was rifling, and told her that she needed to leave.

22.  Cassandra, who was headed back home from work to deal with the dispute, called 911 to report Miller-Griffith's unwanted presence in her home, and asked police to come and escort her daughter out of the apartment, as she no longer lived there and was trespassing.

23.  In response, Miller-Griffith also called 911 and told the operator that she lived in the residence and was there to pick up her things. The NYPD responded to the scene, made a report of the domestic incident, and left after Cassandra made clear that her daughter was trespassing.

24.  Two days later on February 7, Miller-Griffith went to the 75th precinct to make a complaint related to the February 5 incident. She identified her mother and Edd in a Facebook photo to police. She also stated that she lived in the residence and was wrongfully evicted, and claimed that her mother was selling marijuana and had a gun in the home.

25.  Without investigating the nature of Miller-Griffith's claims or otherwise determining who had lawful occupancy rights over the apartment, and without securing any arrest or search warrants, the Individual Defendants escorted Miller-Griffith to Plaintiffs' apartment and told her that they would assist her with retrieving her things from Cassandra's apartment.

26.  While Miller-Griffith remained downstairs in a marked police car, multiple NYPD officers, both uniformed and in plain clothes, arrived at the front door of the apartment and asked Cassandra for consent to enter the home to speak with her. Cassandra declined, but voluntarily offered to come into the hallway to speak to the officers, closing the front door behind her.

27.  From the beginning of the interaction with Cassandra, Individual Defendants took the position that Miller-Griffith was wrongfully evicted from the home and should be allowed to come inside, with the police, and gather her things.

28.  But Cassandra made clear that she was the rightful occupant of the apartment, whose name was on the lease, and who remained solely responsible for the rent. She further stated that

she was uncomfortable with the police or her adult daughter coming inside of her home, and insisted that the officers obtain a warrant if they wanted to do so.

29.   Cassandra even showed the officers proof of payment related to her occupancy, but they continued to insist that Miller-Griffith could enter and take the items she claimed were her own.[2] Miller-Griffith, however, was not listed on the lease and no longer held any occupancy interest in the home and ceased all payments associated with the residence.

30.   The Individual Defendants became visibly frustrated and impatient with Cassandra's assertion of her right to be free from unlawful searches and seizures, and they started threatening Cassandra's arrest for "unlawful eviction" if she refused to let them in.

31.   Cassandra's refusal to let police or a trespasser into her home, of course, did not constitute probable cause to arrest her, and Cassandra knew this.

32.   After telling police some form of  "no," "I don't have to let you in," or "you do not have my permission to come in" at least fifteen times in less than fifteen minutes, Cassandra ceased her voluntary conversation with police, announced that she was going inside, walked into her home, and attempted to close the apartment door behind her.

33.   Martin quickly stepped across the door's threshold into the apartment and put his boot against the door to prevent Cassandra from closing it. Cassandra reiterated *again* that she did not consent to the officers' entry, and Martin replied, "I'm gonna arrest you."

34.   The officers then poured into the apartment and immediately grabbed Edd, told him he was under arrest, and cuffed him.

35.   One by one, the Individual Defendants followed Martin into the home and started unlawfully canvassing and searching each room.

---

[2] Cassandra's NYPD Property Invoice shows that, upon arrest, she had in her possession a number of envelopes, including one with a utility bill, bearing her name and the address of the apartment in question.

36.  During this time, Cassandra was repeating over and over again how the entry was unlawful and the officers did not have her permission to be in her home, her bedroom, or to touch and go through her things.

37.  Despite these protestations, Officer Sharma flipped on the lights in Cassandra's bedroom, located at the back of the home, and threw clothing from the bed, revealing a small amount of marijuana.

38.  The marijuana was not "in plain sight" as the officers later claimed. Nor was it in public, and thus possession of it was not a crime under New York law. Further, the amount was de minimus, and thus not a crime under federal law either.

39.  Cassandra was placed into overly tight handcuffs. She repeatedly asked the officers to loosen them, but they refused. As a result of this excessive force, she sustained an injury to her wrist and an exacerbation of the injury to her back.

40.  The officers remained in the apartment for at least a half hour while Martin and the other Individual Defendants searched various rooms and collected a list of items, which they then used to procure a search warrant the following day.

### Defendants' Fabrications and Plaintiffs' Overdetention

41.  On February 8, 2019—one day *after* the officers unlawfully entered and searched Plaintiffs' home and arrested them—Defendant Officer Manny Sharma appeared before the Honorable Deborah A. Dowling in the Criminal Division of the Supreme Court, Kings County, in support of his application for a search warrant of Plaintiffs' home.

42.  In his application to the court, Sharma made materially false statements regarding the nature of the entry and search that took place the day before at Plaintiffs' apartment.

43.  Sharma stated, in sum and substance, that on February 7, he informed Cassandra that she was under arrest, prompting her to flee into her apartment. This was a lie, proven by the body worn camera footage.

44.  Sharma went on to claim that he saw Cassandra throw clothing onto the bed "in a failed attempt to cover a ziplock bag of green leafy substance" along with various paraphernalia used for smoking marijuana. But Sharma affirmatively entered the darkened bedroom, turned on the lights, and searched Casandra's bed without consent or probable cause.

45.  By the time the officers procured the search warrant using these materially false statements and returned to the apartment to conduct a second search, Plaintiffs had already been in custody for over 48 hours without arraignment, compounding the multiple constitutional violations committed against them.

46.  Edd was finally arraigned on February 9, 2019, and was held on $1,000 bail.

47.  Cassandra was also arraigned on February 9, 2019, and was released on her own recognizance.

48.  Following months of court appearances, the charges against Edd were dismissed on November 7, 2019, when the Court granted his motion to dismiss.

49.  Cassandra's case was later dismissed on November 19, 2019.

## THE INDIVIDUAL OFFICERS' HISTORY OF MISCONDUCT

50.  Prior to his forced retirement following the CCRB's substantiation of Cassandra's complaints relating to the unlawful entry into her home, Sergeant Martin had a long history of unchecked abuse of his power as a police officer.

51.  According to disciplinary records obtained from the CCRB and the Brooklyn District Attorney's Office, Martin was subject to at least nineteen separate civilian complaints, including

a number of complaints alleging unlawful entry or search into a private home.[3] Most notably, just eight months prior to the incident alleged herein, the CCRB substantiated a claim against Martin for an unlawful search of a premises.

52.   Officer Sharma also has a history of complaints against him for abuses of his authority in the form of unlawful stops and search accompanied with physical force and destruction of property.

53.   Despite these repeated incidents of misconduct, the City of New York of New York has failed to meaningfully discipline or properly supervise Martin and Sharma, along with the other Individual Defendants who unlawfully entered and search Plaintiffs' home.

### FIRST CLAIM FOR RELIEF:
### UNLAWFUL ENTRY UNDER 42 U.S.C. § 1983
### AGAINST THE INDIVIDUAL DEFENDANTS

54.   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

55.   The Individual Defendants entered Plaintiffs' home without a warrant and in the face of express denial of consent to enter.

56.   That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of civil rights guaranteed under the Fourth Amendment to the United States Constitution

---

[3] After the repeal of NY Civil Right Law § 50-a, NYPD disciplinary records became publicly available through the following sources: Joseph, George, "Brooklyn DA Releases Massive Trove Of Internal Documents On NYPD Misconduct," Gothamist (Aug. 2, 2021), *available at* https://gothamist.com/news/brooklyn-da-releases-massive-trove-internal-documents-nypd-misconduct; "NYC Federal Civil Rights Lawsuit Database, 2015–June 2018, CAPstat, *available at* https://www.capstat.nyc/; Willis, Derek et al., "The NYPD Files," ProPublica (July 26, 2020), *available at* https://projects.propublica.org/nypd-ccrb/; NYPD Online, *available at* https://nypdonline.org/link/1026; "NYPD Member of Service Histories," NYC Civilian Complaint Review Board, *available at* https://www1.nyc.gov/site/ccrb/policy/MOS-records.page.

to be free from unreasonable or unlawful searches and seizures, and the Individual Defendants therefore are liable to Plaintiffs for damages under 42 U.S.C. § 1983.

57.  As a result of the above unconstitutional conduct, Plaintiffs were caused to suffer physical, economic, and emotional injuries, as well as deprivations of their liberty.

58.  As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

## SECOND CLAIM FOR RELIEF:
## UNREASONABLE SEARCH AND SEIZURE UNDER 42 U.S.C. § 1983
## AGAINST THE INDIVIDUAL DEFENDANTS

59.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

60.  The Individual Defendants entered Plaintiffs' home without a warrant or consent and proceeding to search the home, recording findings for a subsequent search warrant.

61.  That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of civil rights guaranteed under the Fourth Amendment to the United States Constitution to be free from unreasonable or unlawful searches and seizures, and the Individual Defendants therefore are liable to Plaintiffs for damages under 42 U.S.C. § 1983.

62.  As a result of the above unconstitutional conduct, Plaintiffs were caused to suffer physical, economic, and emotional injuries, as well as deprivations of their liberty.

63.  As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

## THIRD CLAIM FOR RELIEF:
## FALSE ARREST UNDER 42 U.S.C. § 1983
## AGAINST THE INDIVIDUAL DEFENDANTS

64. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

65. The Individual Defendants restrained and arrested Plaintiffs without probable cause.

66. Even if probable cause existed, the arrests were nonetheless unconstitutional because they followed an unlawful entry into their home.

67. The detention was also unreasonable in that Plaintiffs were held more than 48 hours without arraignment while the Individual Defendants attempted to elicit evidence to provide probable cause.

68. That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of civil rights guaranteed under the Fourth Amendment to the United States Constitution to be free from unreasonable or unlawful searches and seizures, and the Individual Defendants therefore are liable to Plaintiffs for damages under 42 U.S.C. § 1983.

69. As a result of the above unconstitutional conduct, Plaintiffs were caused to suffer physical, economic, and emotional injuries, as well as a deprivations of their liberty.

70. As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

**FOURTH CLAIM FOR RELIEF:**
**DUE PROCESS VIOLATIONS UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

71. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

72. The Individual Defendants provided false evidence and statements and withheld exculpatory information to the prosecution, defense counsel, and court, including, but not limited to, the true circumstances of the entry into Plaintiffs' home and their subsequent arrests.

73.   That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of due process and trial rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to be free from prosecution based on false statements and under *Brady v. Maryland*,  373 U.S. 83 (1963), and the Individual Defendants are therefore liable to Plaintiffs for damages under 42 U.S.C. § 1983.

74.   As a result of the above unconstitutional conduct, Plaintiff s were caused to suffer physical, economic, and emotional injuries, as well as a deprivations of their liberty.

75.   As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

## FIFTH CLAIM FOR RELIEF:
## FAILURE TO INTERVENE AND CONSPIRACY UNDER 42 U.S.C. § 1983
## AGAINST THE INDIVIDUAL DEFENDANTS

76.   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

77.   The Individual Defendants failed to intervene to prevent, end, or report the unlawful and unconstitutional conduct to which Plaintiffs were subjected, despite the fact that they had multiple opportunities to do so.

78.   The Individual Defendants thereby displayed deliberate indifference to Plaintiffs' rights, including Plaintiffs' rights to be free from unreasonable and unlawful searches and seizures.

79.   The Individual Defendants also Defendants agreed among themselves and with other individuals to act in concert and thus conspired to deprive Plaintiffs of their clearly established civil rights.

80.  That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of civil rights guaranteed under the Constitution of the United States, and the Individual Defendants therefore are liable to Plaintiffs for damages under 42 USC § 1983.

81.  As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as deprivations of their liberty.

82.  As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

## SIXTH  CLAIM FOR RELIEF:
### *MONELL* CLAIMS AGAINST THE CITY OF NEW YORK

83.  Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

84.  The City of New York is liable for the conduct of the Individual Defendants under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) because the driving force behind these constitutional violations were the *de facto* and explicit policies and practices of the NYPD and the City of New York.

85.  The City of New York consistently fails to properly train, supervise, and discipline their officers for flagrant civil and constitutional violations.

86.  Specifically, the NYPD has a pattern and practice of ignoring repeated violations of the Fourth Amendment by its officers, intentionally turning a blind eye or otherwise covering up stops and seizures made without probable cause and/or warrantless entries and arrests.

87.  As a result, officers with lengthy disciplinary histories climb the ranks of the NYPD, gain supervisory and command positions, and are able to wield their power more strongly and/or engage in continued violations of the law, perpetuating these cycles of misconduct.

88.   In contrast, based on data published by Pro Publica covering CCRB investigations from September 1985 to January 2020, the CCRB substantiated misconduct findings against 1,374 NYPD officers who engaged in illegal searches, *i.e.* Fourth Amendment violations.

89.   These officers not only kept their jobs—half of them were given promotions:

    i.   2 Inspectors engaged in illegal searches, one later became a chief and the other a deputy chief (100%);

    ii.   4 Deputy Inspectors engaged in illegal searches, all 4 were later promoted (100%);

    iii.   10 Captains engaged in illegal searches, and 4 were later promoted (40%);

    iv.   46 Lieutenants engaged in illegal searches, and 23 were alter promoted (50%);

    v.   152 Detectives engaged in illegal searches, 48 were later promoted (32%);

    vi.   226 Sergeants engaged in illegal searches, 111 were promoted (49%);

    vii.   794 police officers engaged in illegal searches, 359 were later promoted (45%).

90.   Of the 359 police officers known to have violated the Fourth Amendment, the vast majority, 291, were promoted to detective—a promotion based entirely on merit.

91.   These substantiated complaints represent the most extreme police misconduct, because CCRB only substantiates complaints when the misconduct is undeniable.

92.   Recently, Eastern District of New York Judge Raymond Dearie J. Dearie reviewed multiple unsubstantiated CCRB closing reports for an officer and found that:

> (1) Investigators systematically refuse to credit testimony by civilian witnesses with regards to use of force yet routinely credit uncorroborated statements by the officers. Investigators decline to substantiate allegations, even when they find them to be plausible, whenever the officers deny the offending conduct. … (2) In one-on-one confrontations between an officer and an individual, the standoff is always resolved in favor of the officer. … (3)

> Investigators reach conclusions that defy common sense and do not logically flow from the investigation's factual record. ... (4) The depth of investigation conducted does not match the gravity of the allegations. ... [and] (5) Investigators do not consider the officer's complaint history to identify patterns in the officer's behavior.

*Jenkins v. City of New York*, 388 F. Supp. 3d 179, 188-91 (E.D.N.Y. 2019).

93.   The 1,374 instances of misconduct listed above, therefore, do not represent all of the allegations of illegal searches which were investigated; rather, they represent only the most severe instances of misconduct, which were proven by substantial evidence.

94.   On November 15, 2020, the New York Times reported that out of 6,900 of the misconduct charges recommended by the Civilian Complaint Review Board, the NYPD leadership reduced the recommended penalty in 71 percent of cases. By far the most common penalty actually imposed for this misconduct is losing a few vacation days.

95.   No matter what the misconduct, NYPD officers almost never lose their jobs. There are approximately 36,000 NYPD officers. The CCRB has investigated move than 48,000 officers over the last several decades, according to data released last year. As of 2020, only nine officers have been terminated following a finding of misconduct.

96.   The CCRB has specifically identified scores of incidents in which NYPD officers ignored, misunderstood, or misapplied standards imposed by the Fourth Amendment related to warrantless entries into a person's dwelling.

97.   For example, a 2016 New York Times article recounted some of these lawless entries, including one in which the officers proclaimed they could "do anything [they] want" in response

to a denial of consent to enter a civilian's home. The officers went on the search the home floor by floor.[4]

98.   In a second example, officers who procured an arrest warrant—not a search warrant—barged into a home unannounced at 5:30 a.m., only to find a woman with her child and grandchild inside. The address on the warrant was outdated and incorrect, and did not provide authority to enter to home to effectuate any arrest.[5]

99.   Then-chairman of the CCRB, Richard D. Emery, stated that these unlawful entries represented a pattern "that could be avoided" by the Department, noting that such entries are often terrifying and have "terribly serious effects on people who are invaded."[6]

100. Even in particularly egregious cases of Fourth Amendment violations, the NYPD refuses to effectively discipline officers.

101. For example, David "Bullethead" Grieco has been the subject of almost three dozen lawsuits and numerous incidents of misconduct, almost all violations of the Fourth Amendment. In one 2020 case, the litigants allege that Grieco and a group of officers "forcefully entered" the Plaintiffs' apartments without consent, arrested its occupants—including a paraplegic man who was subjected to excessive force—and unlawfully searched each apartment in the home.[7] On a separate occasion, Grieco burst into a home without a warrant and detained six-year old twins, who he then transported to the precinct.[8]

---

[4] Baker, Al, "Review Agency Faults New York Police Department on Unlawful Searches," The New York Times (Feb. 29, 2016), available at https://www.nytimes.com/2016/03/01/nyregion/new-york-police-faulted-by-agency-for-unlawful-searches.html.
[5] *Id*.
[6] *Id*.
[7] *See* Complaint in *Laroc et al v. City of New York et al*., Case No. 20-cv-5227 (E.D.N.Y.) at ECF Doc No. 1.
[8] *See* Offenhartz, Jake, "Here Are NYC's Most Sued Cops Who Are Still On The Job, According To New Public Database," Gothamist (Mar. 7, 2019), available at https://gothamist.com/news/here-are-nycs-most-sued-cops-who-are-still-on-the-job-according-to-new-public-database

102. Nonetheless, Grieco was promoted to sergeant in 2018 after making over $190,000 in fiscal year 2017. The City has paid over $600,000 in settlements arising from Grieco's unlawful tactics, yet the NYPD continues to allow Grieco to remain on the force with almost no oversight or discipline whatsoever.

103. These patterns of unlawful searches and seizures are present at every level of the NYPD command, demonstrating that (1) the culture and policies of the NYPD have long failed to protect the Fourth Amendment rights of New Yorkers; and (2) officers who have substantiated complaints regarding violations of the Fourth Amendment have no trouble climbing to the highest ranks of the department, further perpetuating these unconstitutional practices.

104. For example, while holding the rank of Commanding Officer of the 44th Precinct, then-Inspector Brian Mullen unlawfully ordered the false arrest of an adult male and his fifteen-year-old minor son inside a hospital where they were visiting an ailing family member. The minor son was the victim of an attempted robbery on the waiting area of the hospital, which triggered the police response. Rather than investigate the crime committed against the teen, Mullen and his officers employed excessive force and arrested the boy and his father. This Fourth Amendment violation was eventually substantiated by the CCRB, who recommended disciplinary action. The NYPD declined to discipline Mullen at all.[9]

105. Chief-of-Crime Control Strategies Michael Lipetri's multiple CCRB complaints include a substantiated complaint from 2015 in which Lipetri, an Inspector at the time, and four other officers barged into a man's home unannounced at 5:00 a.m. where the man and his family members, including two children, were sleeping. Not only was the entry itself unlawful, but the

---

[9] *See* Amended Complaint in Valarezo *Jr. et al. v. City of New York et al.*, Index No. 24518/2017E (Sup. Ct. Bronx Co.) at NYSCEF Doc. No. 137.

officers also broke into the wrong home. No one bearing the name on the arrest warrant lived in or was present in the apartment. Lipetri received "instructions" for the violation.[10]

106. Before Chief of Department Rodney Harrison was promoted, he was a sergeant at the 83rd Precinct in Brooklyn when he and a group of officers stormed the apartment of a mother and her five children with their weapons drawn, claiming that they were searching for the children's father. The CCRB recommended departmental charges, but the NYPD imposed command discipline—which almost always amounts to a loss of vacation days.[11]

107. In 2011, Harrison was accused of threatening a tenant with arrest if she did not consent to a search of her son's locked room, who was the intended subject of an unlawful entry into the woman's home. After threatening her into submission, Harrison forced the woman to write a letter stating that he had permission to search the locked bedroom. The CCRB charges of an unjustified entry and threat of arrest were substantiated.[12]

108. Even NYPD Police Commissioner Dermont F. Shea has at least one substantiated CCRB complaint for violations of the Fourth Amendment on his record, which included an illegal vehicle stop, illegal search of persons, and illegal search of a car. When the CCRB recommended charges, the NYPD instead ordered that Shea and the other involved officer undergo departmental "instructions."[13]

109. Because of these practices maintained by the NYPD, Martin, Sharma, and the other Individual Officers had no reason to believe they would receive any meaningful punishment for violating the Fourth Amendment, nor did they have reason to believe that violating the Fourth

---

[10] Smith, Greg B., "Misconduct Complaints Trailed NYPD Commissioner Shea and Other Police Brass' Rise to the Top," The City (Mar. 22, 2021), available at https://www.thecity.nyc/2021/3/22/22345475 /nypd-misconduct-complaints-trailed-shea-police-brass.
[11] *Id.*
[12] *Id.*
[13] *Id.*

Amendment in the course of their duties would in any way impair their chances of being promoted or continuing on to a lengthy and decorated career in the department.

110. As a result of these unconstitutional policies and practices, Plaintiffs' were deprived of their constitutional rights, and the City of New York is liable under *Monell* for any damages caused by the Individual Defendants, except for punitive damages.

**SEVENTH CLAIM FOR RELIEF:**
**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

111. Plaintiff Cassandra repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

112. The Individual Defendants used physical force against Plaintiff.

113. Plaintiff Cassandra's seizure and detention at the hands of the Individual Defendants was made in the absence of probable cause. The unwanted physical contact was therefore unlawful and unconstitutional.

114. Even assuming arguendo that Plaintiff Cassandra's arrest was lawful, the Individual Defendants engaged in the use of force that was excessive, malicious, gratuitous, and with the intention of inflicting physical and emotional harm to plaintiff.

115. That by virtue of the aforementioned acts by the Individual Defendants, Plaintiff Cassandra was deprived civil rights guaranteed under the Fourth Amendment to the United States Constitution to be free from unreasonable or unlawful searches and seizures, and the Individual Defendants therefore are liable to her for damages under 42 U.S.C. § 1983.

116. As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries.

117. As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Individual Defendants, as well as the City of New York:

      a.      Compensatory damages;

      b.      Punitive damages;

      c.      The convening and empaneling of a jury to consider the merits of the claims herein;

      d.      Costs and interest and attorney's fees;

      e.      Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
      April 1, 2022

Rickner PLLC

By:      /s/

      Rob Rickner

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*