**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**CASSANDRA ALEXANDER** and **EDD ALEXANDER,**

Plaintiffs,

-against-

**THE CITY OF NEW YORK, SGT. DAMON MARTIN; SGT. JAMES PRIORE; OFFICER MANNY SHARMA; and OFFICER DOES 1–5,**

Defendants.

Dkt. No. 21-CV-5816

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**

Rickner PLLC
14 Wall Street, Suite 1603
New York, NY 10005

On the Brief:

Robert Rickner, Esq.
Stephanie Panousieris, Esq.

## TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... i

**TABLE OF AUTHORITIES** .......... ii

**PRELIMINARY STATEMENT** .......... 1

**THE FACTS ALLEGED** .......... 2

a. The February 5, 2019 Incident .......... 2

b. The February 7, 2019 Complaint and Failure to Investigate .......... 3

c. The February 7, 2019 Warrantless Entry and Plaintiffs' Arrests .......... 4

d. The Warrant Application .......... 7

e. The Second Search of Plaintiffs' Residence .......... 8

f. Plaintiffs' Pre-Arraignment Detention and Prosecution .......... 8

**ARGUMENT** .......... 9

I. Standard .......... 9

II. Defendants' Entry and Search of the Apartment was Plainly Unconstitutional. .......... 9

III. Even if the Initial Entry Was Justified, Defendants' Lengthy Intrusion Afterwards was Plainly Unconstitutional .......... 12

IV. Delaying Arraignment to get a Warrant and Search the Apartment Again, to Justify More Charges, was Plainly Unconstitutional. .......... 13

**CONCLUSION** .......... 15

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 9

*Case v. City of New York*, 233 F. Supp. 3d 372 (S.D.N.Y. 2017) .......... 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 9

*Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991) .......... 13, 14, 15

*Gerstein v. Pugh*, 420 U.S. 103 (1975) .......... 13

*Gonzalez v. Bratton*, 147 F. Supp. 2d 180 (S.D.N.Y. 2001), *aff'd*, 48 F. App'x 363 (2d Cir. 2002) .......... 14

*Groh v. Ramirez*, 540 U.S. 551 (2004) .......... 10

*Harris v. O'Hare*, 770 F.3d 224 (2d Cir. 2014), as amended (Nov. 24, 2014) .......... 10

*Kerman v. City of New York (Kerman I)*, 261 F.3d 229 (2d Cir. 2001) .......... 9

*Kyllo v. United States*, 533 U.S. 27 (2001) .......... 10

*Lange v. California*, 141 S. Ct. 2011 (2021) .......... 10

*Levantino v. Skala*, 56 F. Supp. 3d 191 (E.D.N.Y. 2014) .......... 14

*Loria v. Gorman*, 306 F.3d 1271 (2d Cir. 2002) .......... 10

*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......... 9

*McDonald v. United States*, 335 U.S. 451 (1948) .......... 10

*Mincey v. Arizona*, 437 U.S. 385 (1978) .......... 12

*Minnesota v. Olson*, 495 U.S. 91 (1990) .......... 12

*Payton v. New York*, 445 U.S. 573 (1980) .......... 9

*People v. Jin Cheng Lin*, 26 N.Y.3d 701 (N.Y. 2016) .......... 13

*Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003) ....................9

*Silverman v. United States*, 365 U.S. 505 (1961) ....................11

*United States v. Place*, 660 F.2d 44 (2d Cir. 1981), aff'd, 462 U.S. 696 (1983) ....................12

*United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011)....................11, 12

*Watson v. City of New York*, 92 F.3d 31 (2d Cir. 1996) ....................13

*Welsh v. Wisconsin*, 466 U.S. 740 (1984)....................10

**STATUTES**

N.Y. Crim. Proc. Law § 180.10 ....................13

Plaintiffs Cassandra Alexander, née Miller ("Cassandra") and Edd Alexander ("Edd") (collectively Plaintiffs) hereby move for partial summary judgment on liability for the First (Unlawful Entry), and Second (Unlawful Search) claims in the First Amendment Complaint against Defendants Sgt. Damon Martin ("Martin"), Sgt. James Priore ("Priore"), and Officer Manny Sharma ("Sharma") (collectively "Defendants"), and for partial summary judgment on liability for the Third (False Arrest – Over-Detention) claim in the First Amendment Complaint, against Officer Manny Sharma.

**PRELIMINARY STATEMENT**

There is no question that Defendants repeatedly violated Plaintiffs' Fourth Amendment right. All the relevant facts are captured on the Defendants' body-worn cameras, and in the official police paperwork, supported by the Defendants' own sworn testimony. There are separate three violations, and Plaintiff should be granted partial summary judgment on liability on all of them.

***First***, Defendants illegally enter Plaintiffs' home. Defendants arrived at Plaintiffs' home, where Cassandra lived and Edd was an overnight guest, and asked to come in, claiming that Cassandra's daughter wanted to come in and get her possessions. Although it is not relevant in the objective analysis, this was almost certainly a ruse, and the Defendants wanted to get inside to search for the firearm that Cassandra's daughter claimed she had seen several days beforehand, and to search for drugs. (Plaintiffs had neither.) Cassandra greeted them at the door, and told them repeatedly that they could not come in, cooperating but asserting her Fourth Amendment rights for roughly 15 minutes. Eventually, she went back inside to check on her dinner, and the Defendants followed, arresting her and Edd. There was no exigency and no warrant, making this entry entirely and disputably illegal.

***Second***, Defendants did not limit their entry and search to the purported exigency and need to arrest Plaintiffs. Instead, they remained in the apartment for roughly 30 minutes, even after Plaintiffs had been taken away in handcuffs, illegally invading and search the apartment further. This too is indisputably illegal.

***And third***, Sharma illegally detained Plaintiffs at the precinct, delaying their arraignment for almost 48 hours, so he could use the illegally obtained information from his search to get a warrant for the apartment—the apartment they had already searched extensively. This also is a violation of the Fourth Amendment, which requires prompt arraignment after arrest. Sharma unlawfully detained Plaintiffs, even though he admitted under oath he could have submitted papers to have them arraigned long before. He wanted Plaintiffs in custody while he obtained a search warrant, even though the apartment had already been secured by an officer.

There is no need for a liability trial on these three claims. The only question, it is submitted, is one of damages.

## THE FACTS ALLEGED

### a. The February 5, 2019 Incident

On the morning of February 5, 2019, Octavia Miller-Griffith ("Miller-Griffith"), entered the apartment of her mother, Plaintiff Cassandra Alexander, at 230 Highland Place, Apt. 3R, in Brooklyn, New York ("the Residence") through an unlocked front door. P.1.[1] At the time, Cassandra was at work, and Plaintiff Edd Alexander ("Edd"), Cassandra's then-fiancé, was the only person inside the Residence. P.2. Miller-Griffith previously lived at the Residence, but had left suddenly sometime in the fall of the previous year, before Thanksgiving 2018, and did not

[1] References to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 are referred to herein as "P._".

return until February 5, purportedly to pick up items she left behind. P.3–P.4. Miller-Griffith began rifling through her mother's dresser drawer, leading Edd to call Cassandra and tell her what was going on. P.5–P.6.

On her way to the Residence, Cassandra called 911 and reported the trespass to police, explained that Miller-Griffith had abandoned the apartment several months prior, and asked police to remove her from the Residence. P.7–P.8. After Edd told Miller-Griffith that Cassandra was calling the police and her mother wanted her to leave, Miller-Griffith also called 911 and reported a "strange man" in her mother's apartment who was preventing her from gathering her belongings. P.9 When asked if she was injured by the operator, Miller-Griffith said no. P.11. Edd recorded Miller-Griffith inside the home while she was on the phone with 911, because he was fearful for his safety. P.12. When Cassandra arrived home and told Miller-Griffith to leave. P.13. Eventually, non-party officers Burke and Mood arrived at the Residence, took a report, and left; no arrests were made on February 5, 2019. P.14.

**b. The February 7, 2019 Complaint and Failure to Investigate**

Two days later on February 7, Miller-Griffith went to the 75th Precinct and spoke to Defendants Sharma and Priore about the February 5 incident. P.15. She told the officers that she was evicted from the residence after an argument with her mother in mid-January; that she returned on February 5 to gather items she left behind; that her mother sold marijuana from the Residence; and that on February 5, she observed a firearm on Cassandra's bed. P.15–P.16. She also claimed that Edd slammed her hand in a dresser drawer and threatened her with a golf club, and that Cassandra threw her out after punching and hitting her on February 5, 2019. P.17. These complaints were put into a domestic incident report, which was drafted by Sharma. P.19. Miller-Griffith asked police to escort her to the Residence so she could pick up the items she claimed to

have left behind; at no time did Miller-Griffith ask the officers to search the Residence, nor did she give them permission to do so. P.29–P.30.

Other than speaking to Miller-Griffith and relying wholly on her allegations about the February 5 incident, the Individual Defendants conducted almost no investigation into the veracity of Miller-Griffith's claims prior to going to the Residence on February 7, 2019. P.22.–P.29. They did not use the NYPD database to find out if there were any prior domestic incidents or reports of drugs or firearms at the location. P.22–P.23. They did not contact the narcotics unit to report the possible sale of marijuana, nor did they try and set up a controlled buy to establish the same, or even try to surveille the location from afar. P.26–P.27. They did not interview any neighbors or other witnesses that may have known about the February 5 dispute or Miller-Griffith's other allegations about her mother. P.28, P.51. And while Miller-Griffith showed a video to Priore from the February 5 incident, it did not show any of these alleged crimes, and Priore did not obtain a copy of it for the investigatory file. P.20–P.21.

Nor did any officer attempt to get a search or arrest warrant based on the information provided to them by Miller-Griffith, despite their position that Miller-Griffith's account provided ample probable cause to arrest both Edd and Cassandra. P.31. Martin later admitted at his deposition, however, that he did not attempt to get a warrant because he did not believe one would issue based on the information the officers had at the time. P.32–P.33.

**c. The February 7, 2019 Warrantless Entry and Plaintiffs' Arrests**

On February 7, 2019, Officers Priore and Sharma escorted Miller-Griffith to the Residence in their squad car, where she remained while the officers entered the building. P.34. The officers knocked on the door of apartment 3R and asked Cassandra if they could come in and talk to her about her daughter, who was downstairs. P.35–P.38. Cassandra, who had opened the Residence door a few inches and spoke to the officers from inside her Residence, asked the

officers what was going on and, when they indicated they wanted to come inside with Miller-Griffith, Cassandra informed them that her daughter no longer lived there and she would not allow either Miller-Griffith or the officers to come inside. P.39–P.48.

After a couple of minutes, Cassandra asked the officers to hold on, went inside the Residence, and returned while on the phone with a neighbor. P.48–P.49. When she entered the hallway to speak to the officers, Cassandra closed the Residence door behind her. P.49. For the next ten or so minutes, Cassandra went back and forth with officers Priore and Sharma about Miller-Griffith's allegations, refuting each, and repeating several times that she was not required to let the police come inside her apartment without warning or a warrant. P.50–P.56. martin and his Field Intelligence team, who accompanied Sharma and Priore to the Residence, joined the conversation upstairs, and Cassandra repeated to Martin that Miller-Griffith did not live there and she objected to any entry into her home. P.57–P.66.

After speaking to Miller-Griffith for just a couple of minutes, Martin began threatening to arrest Cassandra for illegal eviction if she did not allow them to enter. P.60–P.62. He even told Cassandra that she could not stop Miller-Griffith from entering and taking whatever she wanted, which shocked and confused Cassandra. P.64–P.66. Cassandra continued to decline the officers her permission to enter, angering Martin, who commented under his breath to Priore that they "may need to arrest someone." P.62–P.68.

After fifteen minutes of this back and forth with police, Cassandra announced that she was "going inside for a minute," walked into the Residence, and attempted to close the front door behind her, repeating that she needed a minute because her food was cooking. P.69. But Martin would not let Cassandra close the front door; instead, crossed the threshold and put his foot door to prevent it from closing, with Priore's assistance. P.70. Cassandra repeated, "I did not say you

could come in" twice, to which Martin responded "I'm gonna arrest you" as he pushed himself into the Residence with Priore and Sharma following behind him. P.71. But the officers did not arrest Cassandra after they entered. Martin walked past Cassandra in the kitchen (the first room of a railroad apartment), grabbed Edd's arm, and arrested him with Priore's assistance. P.74.

Seconds later, Sharma pulled out his flashlight and began shining it down the darkened railroad apartment over Cassandra's head. P.75. Cassandra turned around, walked to the last room at the back of the apartment, turned off the lights, and told the officers they could not enter her bedroom. P.76. Sharma, who could not see the contents of the primary bedroom from the kitchen, followed Cassandra and flipped the lights back on as Cassandra verbally protested this invasion of privacy. P.78. While in the bedroom, Sharma observed a small amount of marijuana on the bed, and immediately placed Cassandra under arrest. P.80.

While inside the apartment, Martin began questioning both Edd and Cassandra about the presence of weapons in the home, but failed to Mirandize them prior to doing so. P.82. The officers began looking around the home, picking up and setting back down various items they now claimed were in "plain view" in the bedroom. P.83. Cassandra continued to verbally protest the entry and arrests throughout the interaction, and in response, Sharma overtightened her handcuffs, causing pain which Cassandra complained about to the officers. P.84–P.85. Both Edd and Cassandra were then removed from the apartment, while Sharma and Priore did yet another walk-through search of the Residence, picking up and taking note of those things they would later include in a search warrant. P.86. No officer saw or recovered any weapons or illegal contraband during the warrantless search; nevertheless, the location was "frozen" while the officers worked to obtain a search warrant. P.87–P.90.

**d. The Warrant Application**

Around 8:30 a.m. on February 8, 2019, while the Alexanders remained in custody, Sharma and Priore went to the Brooklyn DA's Office to draw up a search warrant for the Residence with the assistance of ADA Robert Kaftal. P.91. Sharma swore to several facts that were either untrue, a distortion of the truth, or omitted information necessary for the Court to make determine whether or not the warrant should issue. P.92–101. He told the Court that he personally told Cassandra that she was under arrest, causing her to flee inside. P.93. This was a lie. He told the Court that he observed and arrested Edd inside the Residence. P.94. This is also untrue. P.74. Perhaps most egregiously, Sharma failed to include any information whatsoever about the 15 minute conversation that preceded the forced entry, during which time Cassandra declined the officers' requests to enter over a dozen times. P.95. He then went on to lie about the circumstances of the entry into Cassandra's bedroom, swearing that Cassandra "ran into the rear of the subject location" in a failed attempt to hide evidence. P.97–P.98. But Sharma could not see into the bedroom from where he was standing in the kitchen, and Cassandra never "ran" away into any room at any time. P.75. Kaftal, who authored the warrant based on Sharma's story, never would have done so if he knew about these lies and omissions, or that the information shared with the Court was the fruit of an illegal entry. P.104.

On February 8, 2019, Officer Sharma appeared before the Honorable Deborah A. Dowling in the Criminal Division of the Supreme Court, Kings County, in support of the application, and lied to the Court about the reasons that the officers had entered the Residence on February 7. P.105–P.107. The Court, relying on this testimony, signed the search warrant the same day. P.108.

**e. The Second Search of Plaintiffs' Residence**

Martin, Sharma, and Priore, along with several other non-party officers from Field Intelligence, re-entered the Residence around 5:00 p.m. on February 8, 2019 to search it pursuant to the warrant obtained that day. P.109. Priore and Sharma first collected the items claimed to be in "plain view" during the February 7 entry, and then joined the other officers in completely flipping the home. P.110. The officers proceeded to spend an hour inside the Residence; they flipped the bed over, moved furniture, and opened every drawer, cabinet, and door in the Residence, and threw everything they touched into the center of the bedroom. P.111. The house was in such disarray that, when Cassandra finally made it home, she thought that she was the victim of a home invasion. P.112.

**f. Plaintiffs' Pre-Arraignment Detention and Prosecution**

After leaving the Residence, Edd and Cassandra were taken to the 75th precinct. Neither party was Mirandized at any point, either before or after they were in custody. P.113. While Plaintiffs were detained, Sharma spoke to ADA Tatiana Benjamin to assist in drafting the criminal complaints against Plaintiffs. P.118. Once again, Sharma failed to share any details about the 15 minute conversation between Cassandra and the officers in the hallway, and he did not tell ADA Benjamin that Cassandra explicitly denied the officers entry into the Residence at least a dozen times before they went inside anyway. P.119. Of course, Benjamin would not have proceeded with the prosecution if she had known the Sharma was not being forthcoming. P.119.

Despite their assertions that they had ample probable cause for various crimes against Plaintiffs, the Individual Defendants did not send Plaintiffs to arraignment as soon as they finished the arrest paperwork; they intentionally held Plaintiffs for nearly two days while they obtained and executed the search warrant, even though they understood that New York Law required arraignment within 24 hours of an arrest P.115–P117. Both Plaintiffs were arraigned

around 7:30 p.m. on February 9, 2019—approximately 47 hours after they were detained. P.120.–P.122. After several months of wrongful prosecution and numerous court appearances, all charges against both Edd and Cassandra were dismissed and sealed on November 9 and November 19, respectively. P.122–P.123.

## ARGUMENT

### I. Standard

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party in deciding whether a genuine issue of material fact exists, nevertheless, once a motion for summary judgment is made and supported, the non-moving party must come forward with specific facts showing there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Genuine issues of material fact exist when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted "if the evidence presented by the nonmoving party is merely colorable, or is not significantly probative . . . or if it is based purely on conjecture or surmise." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citations and internal quotes omitted)

### II. Defendants' Entry and Search of the Apartment was Plainly Unconstitutional.

"Warrantless searches are presumptively unreasonable." *Kerman v. City of New York (Kerman I)*, 261 F.3d 229, 235 (2d Cir. 2001) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). The Supreme Court has made it clear that, "any physical invasion of the structure of the

home, by even a fraction of an inch," is too much. *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quotation omitted). "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." *McDonald v. United States*, 335 U.S. 451, 455 (1948).

One of the rare exceptions to this long-held rule is when the police face a real emergency, requiring immediate entry. "[W]hen the officer has time to get a warrant, he must do so," unless there is a true good reason, *i.e.*, "to prevent imminent harms of violence, destruction of evidence, or escape from the home." *Lange v. California*, 141 S. Ct. 2011, 2024 (2021). There are multiple factors courts consider, but "the essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) (internal quotation marks omitted).

Further, the officers must have personal knowledge of actual facts conclusively demonstrating that there is an exigency. "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.'" *Id*. at 1284-85 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). "[G]eneral knowledge, without more, cannot support a finding of exigency." *Harris v. O'Hare*, 770 F.3d 224, 235 (2d Cir. 2014), as amended (Nov. 24, 2014).

The Defendants' claim that the alleged firearm was itself an exigency requiring immediate entry into the apartment has been squarely rejected by the Second Circuit: "[A] warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Id*. at 236 (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). Put simply, the Second

Circuit refused, "to extend the exigent circumstances exception to occasions in which the only claimed urgency is the alleged presence of a firearm." *Id*. at 237.

Cassandra's reentry into the apartment to check on her dinner also did not create an exigent circumstance—it was her fundamental right. "At the very core stands the right of a [wo]man to retreat into [her] own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961).

And any speculation that she was going to throw a golf club out of the window, destroy evidence, or come back shooting at the officers fails to justify the intrusion because, "retrospective speculation does not translate to exigency." *United States v. Simmons*, 661 F.3d 151, 159 (2d Cir. 2011). None of the officers testified that they felt like they were in actual danger. The entire conversation had been about an eviction, so Cassandra had no reason to believe that the officers were looking for weapons or drugs. She had never been threatening or violent; she just wanted the officers to stay out of her apartment, and the officers had no reason to believe she was lying about wanting to check on her dinner. And she had been outside talking to the Defendants for almost 15 minutes while Edd—who the Defendants knew about and were also looking for— was inside the apartment. Had they had any real concerns about destruction of evidence or violence, they would not have stood outside for that long while Edd could have been in the apartment doing something nefarious. Martin even admitted that the evidence he had about the firearm was not enough to go to the ADA to get a warrant. If it wasn't enough for a warrant, it surely wasn't enough to create an exigency. Finally, although not binding, the CCRB investigation found that the entry was illegal and unjustified, and recommended that Martin resign from the NYPD.

In sum, the undisputed facts demonstrate that entering the apartment was a violation of Cassandra's Fourth Amendment right to keep the Defendants out of her apartment, unless they got a warrant. Likewise, Edd 's rights were also violated, as a guest in the apartment. *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (finding that overnight guests also have a reasonable expectation of privacy in the home where they are staying). The only issue at trial, on this claim, is the damages to be awarded for this illegal entry and subsequent search.

## III. Even if the Initial Entry Was Justified, Defendants' Lengthy Intrusion Afterwards was Plainly Unconstitutional.

"[A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (internal quotation marks omitted). This rule has been strictly construed to when, "the police cannot obtain the timely issuance of a warrant without losing the criminal or his contraband." *United States v. Place*, 660 F.2d 44, 47 (2d Cir. 1981), aff'd, 462 U.S. 696 (1983). For example, in *United States v. Simmons*, the suspect had been handcuffed and told the officers where his gun was, but the Second Circuit still found that the officers violated the Fourth Amendment when they went back into the bedroom and found the gun exactly where the suspect told them it was. 661 F.3d 151, 158 (2d Cir. 2011).

Here, even if the Defendants were justified in crossing the threshold to arrest Cassandra, they were not justified in doing anything else. Cassandra was in the kitchen, repeatedly telling the officers she did not want them in her apartment, without being in the. And Edd was immediately arrested. No matter what the officers were concerned with, all they needed to do was arrest Cassandra, leave the apartment, and post an officer outside while they went to get a warrant. There was no justification for the officers staying in the apartment and searching—for approximately 30 minutes, including after Cassandra and Edd had left.

Even if the initial entry was justified, the undisputed facts prove that the Defendants still violated Cassandra and Edd's Fourth Amendment rights by engaging in a lengthy intrusion and search for far longer than needed. The only issue for trial is the amount of damages that should be awarded for this violation.

## IV. Delaying Arraignment to get a Warrant and Search the Apartment Again, to Justify More Charges, was Plainly Unconstitutional.

Under the Fourth Amendment, a probable cause "determination must be made by a judicial officer either before or promptly after arrest." *Gerstein v. Pugh*, 420 U.S. 103, 124–25 (1975). As long as a state's criminal justice system "provides judicial determinations of probable cause within 48 hours of arrest," that system complies with "the promptness requirement of Gerstein and thus "will be immune from systemic challenges." *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). But unreasonable delays, even when arraignment is complete within 48 hours, can still violate the Fourth Amendment. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id*. at 56–57.

Under New York law, probable cause is determined by a judge at arraignment, and a delay of more than 24 hours is "presumptively unnecessary." *People v. Jin Cheng Lin*, 26 N.Y.3d 701, 722 (N.Y. 2016); N.Y. Crim. Proc. Law § 180.10 (the primary purpose of arraignment "is to determine whether the defendant is to be held for the action of a grand jury with respect to the charges contained therein" and the defendant "has a right to a prompt hearing upon the issue of whether there is sufficient evidence to warrant the court in holding him for the action of a grand jury"). The 24-hour requirement under New York law does not, however, create an independent right to a quicker arraignment; the McLaughlin rule still applies to Fourth Amendment claims. *See Watson v. City of New York*, 92 F.3d 31, 38 (2d Cir. 1996). But the general practice, and the

expectation of arresting officers like Sharma, is that arraignment will be completed, as a matter of course, within 24 hours.

Following this framework, courts regularly find that delaying arraignment, even for less than 48 hours, violates the Fourth Amendment, if the plaintiff can prove that the delay was improper under McLaughlin, such as proof of ill will, delay for delay's sake, or they delay was to gather more evidence. For example, in *Case v. City of New York*, the court found that an arraignment 15 to 20 hours after arrest was unreasonable because the officers delayed arraignment to prevent the plaintiffs from protesting. 233 F. Supp. 3d 372, 387 (S.D.N.Y. 2017). And in *Gonzalez v. Bratton*, the court denied the defendants' motion for a new trial because there was evidence that the arraignment, 27 hours after arrest, and related detention, was deliberately delayed by an officer. 147 F. Supp. 2d 180, 201 (S.D.N.Y. 2001), *aff'd*, 48 F. App'x 363 (2d Cir. 2002); *see also Levantino v. Skala*, 56 F. Supp. 3d 191, 204 (E.D.N.Y. 2014) (allowing amended claim where the officers "deliberately delayed processing of paper work," even though the detention was "considerably less than the threshold 48 hours").

Here, there is no question that Plaintiffs' arraignments were delayed, well over 24 hours and nearly 48 hours, simply for delay's sake and to gather additional evidence. Sharma testified that he was well aware, and the arrest paperwork confirms, that until he processed the arrest with the ADA, there would be no arraignment. And he readily admits that he could have had Plaintiffs arraigned on the charges for which there was probable cause while he sought a search warrant to obtain evidence of other alleged crimes. Moreover, the Defendants did not need Plaintiffs in custody for anything. The apartment had been secured and there is no evidence that there was some problem with processing them or that they themselves needed to be searched or questioned.

Sharma simply delayed arraignment so he could get a search warrant and bring additional charges. This is exactly what *McLaughlin* explicitly forbids.

While these undisputed facts are more than enough to prove that Sharma violated Plaintiffs' Fourth Amendment rights, they are buttressed by the undisputed facts of what Sharma was doing while Plaintiffs were in custody. He went to the ADA and used evidence that was obtained during the illegal entry into the home to apply for a search warrant, as well as using statements obtained from Plaintiffs, while they were in handcuffs, without *Miranda* warnings. And, of course, he never told the ADA that he had obtained this evidence illegally. So, it is undisputed, that he had Plaintiffs illegally detained in the precinct while he violated Plaintiffs' rights in applying for a search warrant to perform yet another search.

Consequently, there is no dispute of fact that Sharma deliberately delayed Plaintiffs' arraignment for no good reason whatsoever, so summary judgment on liability should be granted in Plaintiffs' favor, with the amount of the excessive detention, and the monetary damages, to be determined by a jury.

## CONCLUSION

Plaintiffs should be granted partial summary judgment, on liability, against all Defendants on the illegal entry claim, and Plaintiffs should be granted partial summary judgment, on liability, against Defendant Sharma on the excessive detention claim. Tjese is no dispute of fact as to these two Fourth Amendment violations, and the only remaining question is damages.

Dated: New York, New York
January 9, 2023

Rickner PLLC

By: /s/

Rob Rickner
Stephanie Panousieris

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*