UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

CASSANDRA ALEXANDER and EDD
ALEXANDER,

                               Plaintiffs,       Dkt. No. 21-CV-5816

              -against-

THE CITY OF NEW YORK, SGT. DAMON MARTIN;
SGT. JAMES PRIORE; OFFICER MANNY SHARMA;
and OFFICER DOES 1–5,

                               Defendants.

------------------------------------------------------------------------ x

## PLAINTIFFS' RESPONSES TO DEFENDANTS' UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

1.      Plaintiffs initiated this action by filing the Complaint on October 18, 2021, naming the City, retired Sergeant Damon Martin, Sergeant James Priore, and Detective Manny Sharma, alleging, inter alia, federal claims of unlawful entry, unreasonable search and seizure, false arrest, fabrication of evidence, post-arrest over detention, and municipal liability. (See Ex. A (Compl.); ECF No. 1.)

**RESPONSE:** Undisputed.

2.      Plaintiffs thereafter filed their First Amended Complaint ("FAC") on April 1, 2022, adding an excessive force claim alleging that overtight handcuffs were placed on Cassandra Alexander. (See Ex. B (FAC); ECF No. 15.)

**RESPONSE:** Undisputed.

3.      Plaintiffs Cassandra Alexander and Edd Alexander are married. Ex. C (Cassandra Dep.) at 27:16-21.

**RESPONSE:** Undisputed.

4.      They have been married since July 5, 2019. Ex. C (Cassandra Dep.) at 27:22-23.

**RESPONSE:** Undisputed.

5.      Plaintiff Cassandra Alexander's maiden name is Miller. Ex. C (Cassandra Dep.) at 21:20-25; 22:1.

**RESPONSE:** Undisputed.

6.      Cassandra and Edd Alexander began living together in April 2019. Ex. G (Edd Dep.) at 14:11-19.

**RESPONSE:** Undisputed.

7.      In February 2019, Edd Alexander was living Rhode Island and came to visit Cassandra. Ex. G (Edd Dep.) at 26:11-21; 27:5-14.

**RESPONSE:** Incomplete. While Edd's permanent residence was in Rhode Island at the time of this incident, he was a regular overnight guest in the Residence beginning in 2018, when the couple began dating, and was a regular overnight guest in February 2019, not a mere visitor. Pl.Ex. 1 at 73:10–74:2; Pl.Ex. 2 at 15:6–11.

8.      Octavia Miller-Griffith ("Ms. Miller-Griffith") is Cassandra Alexander's daughter. Ex. C (Cassandra Dep.) at 29:7-12.

**RESPONSE:** Undisputed.

9.      On February 7, 2019, Ms. Miller-Griffith went to the NYPD 75th Precinct and spoke with Sergeant Priore and Detective Sharma. Ex. D (Sharma Dep.) at 11:16-19; 12:13-19; 14:3-20; Ex. E (Priore Dep.) at 12:1-4, 12:19-25.

**RESPONSE:** Undisputed.

10.     Ms. Miller-Griffith stated that she was looking for a police escort to gather property from her apartment. Ex. E (Priore Dep.) at 12:19-25, 13:2-19.

2

**RESPONSE:** Undisputed.

11.     Ms. Miller-Griffith explained that she lived at her apartment for approximately eight years with her mother Cassandra Alexander, that the two had gotten into an argument a few weeks prior, that Ms. Miller-Griffith was temporarily staying elsewhere in order to quell the altercation, and that she wanted to gather some of her and her child's belongings from the apartment. Ex. D (Sharma Dep.) at 20:2-15; Ex. E (Priore Dep.) at 18:3-15.

**RESPONSE:** Disputed. While Miller-Griffith previously lived in Cassandra's apartment, she vacated several months before, sometime in September or October, prior to Thanksgiving 2018, which Cassandra repeatedly told the officers when they came to her apartment on February 7, 2019. Pl.Ex. 1 at 29:17–25, 62:14–63:2, 72:20–73:1; Pl.Ex. 2 at 28:8–29:2; Pl.Ex. 9; Pl.Ex. 12 at 20:40:54–41:19. Cassandra also told 911 that her daughter was trespassing on February 5, 2019. Pl.Ex. 1 at 74:3–19; Pl.Ex. 9.

12.     Ms. Miller-Griffith also stated that on February 5, 2019, she got into a physical altercation with Cassandra Alexander and a man who she was not really acquainted with. Ex. D (Sharma Dep.) at 17:5-25; 18:2-6; Ex. E (Priore Dep.) at 13:2-8.

**RESPONSE:** Disputed. Miller-Griffith told 911 was she was not injured during the February 5 dispute, and then changed her story when she went to the precinct two days later. Pl.Ex. 10 at 02:25–30. The video Miller-Griffith showed to the officers did not establish that she was assaulted. Pl.Ex. 3 at 20:9–21:17. Edd's cell phone footage corroborates this fact. Pl.Ex. 11.

13.     Specifically, Ms. Miller-Griffith stated that on February 5, 2019 she went to her apartment to gather some of her and her child's belongings. Ex. E (Priore Dep.) at 13:8-12.

**RESPONSE:** Undisputed.

14.    When Ms. Miller-Griffith entered the apartment, there was a man (Edd Alexander) inside the apartment. Ex. E (Priore Dep.) at 13:12-14.

**RESPONSE:** Undisputed.

15.    Ms. Miller-Griffith stated that the man was in a relationship with her mother. Ex. D (Sharma Dep.) at 17:5-16.

**RESPONSE:** Undisputed.

16.    When Ms. Miller-Griffith tried to go into a dresser drawer, the man slammed the drawer on her hands, causing her pain. Ex. D (Sharma Dep.) at 17:5-25; 18:2-6; 42:3-6; Ex. E (Priore Dep.) at 13:14-19.

**RESPONSE:** Disputed. When she entered the Residence on February 5, 2019, Miller-Griffith entered her mother's bedroom, and began going through Cassandra's dresser. Pl.Ex. 1 at 74:3–19; Pl.Ex. 12 at 20:39:54–40:54. Miller-Griffith told 911 was she was not injured during the February 5 dispute, and then changed her story when she went to the precinct two days later, despite having no evidence of injury. Pl.Ex. 10 at 02:25–30. The video Miller-Griffith showed to the officers did not establish that she was assaulted. Pl.Ex. 3 at 20:9–21:17. Edd's cell phone footage corroborates this fact. Pl.Ex. 11.

17.    The man called Cassandra Alexander on his cellphone. Ex. D (Sharma Dep.) at 17:17-18.

**RESPONSE:** Undisputed.

18.    Plaintiff Cassandra Alexander, then came to the apartment. Ex. D (Sharma Dep.) at 17:17-25; 18:1-6; Ex. E (Priore Dep.) at 13:17-19.

**RESPONSE:** Incomplete. While Cassandra was on her way home, she first called 911 to report the incident, and in response, Miller-Griffith also called 911. Pl.Ex. 1 at 74:3–19; Pl.Ex. 9;

4

Pl.Ex. 10. Cassandra told 911 that her daughter was trespassing in her home, and Miller-Griffith told 911 she was not injured. Pl. Ex. 9; Pl.Ex. 10 at 02:25–30.

19.     Ms. Miller-Griffith reported that a verbal argument became physical, and resulted in plaintiffs punching and kicking her, and physically throwing her out of the apartment. Ex. D (Sharma Dep.) at 17:17-25; 18-2; Ex. E (Priore Dep.) at 13:17-19.

**RESPONSE:** Undisputed that Miller-Griffith reported an altercation with her mother. Disputed as to the truth of the report and the officers' knowledge that Miller-Griffith was not actually assaulted; Miller-Griffith showed the officers a video from the February 5, 2019 incident, which Defendants failed to copy or preserve, which established that Miller-Griffith was not assaulted by Plaintiffs as she described to police. Pl.Ex. 3 at 20:9–22:13; Pl.Ex. 4 at 26:8–27:22.

20.     Ms. Miller-Griffith stated that Cassandra and the man would not let her back inside the apartment. Ex. E (Priore Dep.) at 24:20-24.

**RESPONSE:** Incomplete. While Plaintiffs told Miller-Griffith she was not welcome at the Residence, Miller-Griffith had no independent right to be in the apartment that she abandoned months before, without the consent of the owner, Cassandra. Pl.Ex. 1 at 29:17–25, 62:14–63:2, 72:20–73:1, 74:3–19; Pl.Ex. 2 at 28:8–29:2; Pl.Ex. 9; Pl.Ex. 12 at 20:40:54–41:19.

21.     Ms. Miller-Griffith also stated that the man picked up a golf club and menaced her with it. Ex. E (Priore Dep.) at 24:20-24.

**RESPONSE:** Disputed and incomplete. Miller-Griffith did not use the term "menace," which implies a legal conclusion related to a criminal charge. Moreover, Miller-Griffith specifically told 911 that Edd was holding a golf club because *he* felt threatened, not because he was threatening her with it. Pl.Ex. 2 at 31:22–33:12; Pl.Ex. 10 at 01:45–55.

22.    Ms. Miller-Griffith also stated that she saw a firearm on Cassandra's bed on February 5, 2019, that she had previously pointed the firearm at her, and that Cassandra sold marijuana from inside the apartment. Ex. D (Sharma Dep.) at 25:2-10; Ex. E (Priore Dep.) at 16:12-13; 23:7-11; 43:17-23.

**RESPONSE:** Undisputed that Miller-Griffith reported to Defendants that she saw a firearm. However, this fact was never reported to 911 on the day in question, which Defendants knew. Pl.Ex. 3 at 15:24–16:17; Pl.Ex. 4 at 15:24–16:12; Pl.Ex. 21.

23.    When Ms. Miller-Griffith mentioned the firearm, Detective Sharma contacted the Field Intelligence supervisor, Sergeant Damon Martin. Ex. D (Sharma Dep.) at 23:5-10; 23:20-25; 24:2-3.

**RESPONSE:** Undisputed.

24.    Sergeant Damon Martin's job responsibilities included gathering valuable and actionable intelligence on trends when it comes to shootings or gang activity to locate firearms and stop violence. Ex. F (Martin Dep.) at 20:12-23.

**RESPONSE:** Undisputed that Martin testified to these responsibilities.

25.    Sergeant Martin had a conversation with Ms. Miller-Griffith on February 7, 2019. Ex. D (Sharma Dep.) at 31; 7-25; Ex. F (Martin Dep.) at 13:14-16.

**RESPONSE:** Incomplete. While Martin testified that he spoke to Miller-Griffith briefly before the first entry, he later testified that he did not know any of the details of what happened between Plaintiffs and Miller-Griffith on February 5, 2019, except that Miller-Griffith called 911, and that no arrests were made on that date. Pl.Ex. 5 at 13:17–15:24, 29:18–30:14; 31:7–32:4.

26.    During her conversation with Sergeant Martin, Ms. Miller-Griffith again indicated that she had lived at the apartment for the past eight years, that she went to the apartment to gather

some of her child's clothes, that she was met by plaintiffs, and while trying to retrieve the clothes, she was assaulted, beat and punched by both plaintiffs, and her hand was slammed in the drawer by Edd Alexander. Ex. F (Martin Dep.) at 14:14-25; 15:2.

**RESPONSE:** Disputed. While Martin testified that he learned these details from Miller-Griffith, he also testified that he did not know any of the details of what happened between Plaintiffs and Miller-Griffith on February 5, 2019, except that Miller-Griffith called 911, and that no arrests were made on that date. Pl.Ex. 5 at 13:17–15:24, 29:18–30:14; 31:7–32:4.

27.     She also informed Sergeant Martin that Cassandra Alexander sells marijuana from the apartment and is in possession of a firearm. *Id.*

**RESPONSE:** Disputed. While Martin testified that he learned about the firearm directly from Miller-Griffith, he also testified that he did not know any of the details of what happened between Plaintiffs and Miller-Griffith on February 5, 2019, except that Miller-Griffith called 911, and that no arrests were made on that date. Pl.Ex. 5 at 13:17–15:24, 29:18–30:14; 31:7–32:4.

28.     On February 7, 2019, defendants, along with other non-party members of the New York City Police Department ("NYPD"), transported Ms. Miller-Griffith to the subject apartment building; she stayed inside a marked police vehicle while the defendant proceeded to the apartment first. Ex. E (Priore Dep.) at 25:18-22; 27:3-10; 34:4-7.

**RESPONSE:** Undisputed.

29.     After entering the building, officers approached the apartment and knocked on the door. Ex. E (Priore Dep.) at 34:8-15.

**RESPONSE:** Undisputed.

30.     Cassandra answered the door. Ex. E (Priore Dep.) at 34:8-15.

**RESPONSE:** Undisputed.

31.     The defendants had a conversation with Cassandra in the hallway outside of the apartment. Ex. F (Martin Dep.) at 44:7-11.

**RESPONSE:** Incomplete. Before Cassandra exited her apartment, she spoke to the officers from behind her front door. Priore asked if the officers could come inside, and Cassandra declined, stating that she would come out to speak to them. She then exited her apartment and closed the front door behind her. Pl.Ex. 1 at 80:23–81:23; Pl.Ex. 5 at 43:16–44:11; Pl.Ex. 12 at 20:22:50–23:44.

32.     In sum and substance, defendants advised Cassandra that her daughter reported that she lived in the apartment and wanted to retrieve some of her belongings, but that Cassandra was not permitting her to do so. Ex. D (Sharma Dep.) at 53:11-20; Ex. C (Cassandra Dep.) at 82:18-22.

**RESPONSE:** Undisputed that the officers relayed this message, in sum and substance.

33.     Cassandra was also told that Ms. Miller-Griffith reported that Cassandra had physically assaulted her a couple of days before. Ex. C (Cassandra Dep.) at 76:21-25; 77:13-16; 148:18-20.

**RESPONSE:** Disputed. The officers did not mention the alleged assault while speaking to Cassandra outside of the apartment prior to their unlawful entry. Instead, they repeatedly stated that Miller-Griffith claims to live and the residence and wanted to come up to gather her things. Pl.Ex. 12 at 20:23:50–25:36. When Cassandra declined, Priore told Cassandra that she could be arrested for unlawful eviction. *Id*. at 20:25:36–46. This back and forth continued after Martin and his team arrived at the front door. Pl.Ex. 5 at 43:16–44:11; Pl.Ex. 12 at 20:28:39–31:07. Martin also repeated the threat of arrest for unlawful eviction. Pl.Ex. 12 at 20:31:07–55. Only after Cassandra repeatedly told the officers they could not enter her home did Martin bring up the

alleged assault, and he did so moments before forcing himself inside the home. Pl.Ex. 1 at 37:24–38:10; Pl.Ex. 12 at 20:35:15–55.

34.     At some point during the conversation, Cassandra ceased the conversation, turned around, went into the apartment and tried to close the door on the defendants. Ex. E (Priore Dep.) at 38:2-4; Ex. F (Martin Dep.) at 48:19-21.

**RESPONSE:** Disputed that Cassandra "tried to close the door on Defendants." Instead, after approximately 15 minutes of voluntarily speaking with police, Cassandra announced that she was "going inside for a minute," walked into the Residence, and attempted to close the front door behind her, stating that she needed a minute because her food was cooking. Pl.Ex. 1 at 37:24–38:10; Pl.Ex. 12 at 20:35:45–55. As Cassandra tried to close the door, Martin crossed the threshold and put his foot door to prevent it from closing. Priore assisted, putting his foot into the door, holding it with his right forearm. Pl.Ex. 5 at 47:12–48:25; Pl.Ex. 12 at 20:35:40–36:10. Cassandra then repeated, "I did not say you could come in," and Martin responded, "I'm gonna arrest you;" Cassandra again said, "I did not say you could come in;" Martin repeated "I'm gonna arrest you" as he pushed himself into the Residence with Priore and Sharma following behind him. Pl.Ex. 5 at 48:22–25; Pl.Ex. 12 at 20:35:40–36:10.

35.     Cassandra took a step or two into the apartment, and while at the threshold, Sergeant Martin told her that she was under arrest. Ex. F (Martin Dep.) at 50:19-25.

**RESPONSE:** Disputed. As Cassandra tried to close the door, Martin crossed the threshold *before* threatening to arrest Cassandra, placing his boot into the doorway to prevent the front door from closing. Priore assisted, putting his foot into the door, holding it with his right forearm. Pl.Ex. 5 at 47:12–48:25; Pl.Ex. 12 at 20:35:40–36:10. Cassandra then repeated, "I did not say you could come in," and Martin responded, "I'm gonna arrest you;" Cassandra again said, "I did not say you

could come in;" Martin repeated "I'm gonna arrest you" as he pushed himself into the Residence with Priore and Sharma following behind him. Pl.Ex. 5 at 48:22–25; Pl.Ex. 12 at 20:35:40–36:10. Nor did the Defendants actually arrest Cassandra after they entered the Residence, undermining their claim that exigency required them to enter. Martin walked past Cassandra in the kitchen, grabbed Edd's arm and arrested him with Priore's assistance. Pl.Ex. 3 at 42:12–17, 44:22–45:7, 62:9–63:25, 69:20–25; Pl.Ex. 5 at 45:15–49:18; Pl.Ex. 12 at 20:36:00– 29.

36.    The defendants then entered the apartment because, based on the information received from Cassandra's daughter, they believed that Cassandra possibly had a firearm and other evidence inside the location that could potentially be disposed of, hidden, or used to create a danger to herself or the officers on scene. Ex. D (Sharma Dep.) at 111:18-25; 112:2-4; Ex. E (Priore Dep.) at 38:5-24; 39:3-12; Ex. F (Martin Dep.) at 50:16-23.

**RESPONSE:** Disputed. Martin testified that he entered the Residence on February 7, 2019 specifically to effect Cassandra's arrest for allegedly assaulting Miller-Griffith on February 5, 2019. Pl.Ex. 5 at 50:3–51:10. He also claimed to have effectuated Cassandra's arrest at the threshold of the apartment, which he did not. *Id.* Priore testified that he intended to obtain Cassandra's permission to enter the Residence and search for the alleged firearm. Pl.Ex. 3 at 62:9–19. More still, Martin admitted that he did not have the requisite probable cause to obtain a warrant prior to the February 7 entry; thus, he cannot reasonably argue his circumstances were exigent, when he previously considered obtaining a warrant and then specifically chose not to apply because (1) the Brooklyn DA would not provide search warrants for marijuana unless it was in "huge quantities"; and (2) the NYPD was not doing controlled buys for marijuana, as it was not considered a "controlled substance," so the officers could not set up such an operation to prove an intent to sell. Pl.Ex. 5 at 51:11–53:19. Martin also subjectively knew believed that he could not

10

get a search warrant for the alleged gun, because too much time had passed between the time Miller-Griffith claimed to have seen the firearm (February 5) and the time the officers wanted to enter the Residence (February 7). According to Martin, any request to the Brooklyn DA's office for a warrant to search for a firearm must be made within 24 hours of the alleged sighting of that firearm. Pl.Ex. 5 at 53:20–54:3.

37.      When the defendants entered the apartment, plaintiff Edd Alexander was in the kitchen area, close to the front door. Ex. E (Priore Dep.) at 41:12-15; Ex. F (Martin Dep.) at 49:13-18.

**RESPONSE:** Undisputed.

38.      Edd Alexander was handcuffed in the kitchen area. Ex. E (Priore Dep.) at 41:12-18; Ex. F (Martin Dep.) at 49:16-18.

**RESPONSE:** Undisputed.

39. Sergeant Priore assisted in handcuffing Edd and stayed with him in the kitchen area. Ex. E (Priore Dep.) at 44:22-25; 45:2-23.

**RESPONSE:** Undisputed that Priore assisted in Edd's arrest and remained with him nea the kitchen until Plaintiffs were removed, at which time Priore and Sharma reentered the apartment and conducted an unlawful search. Pl.Ex. 15; Pl.Ex. 16; Pl.Ex. 23.

40.      Cassandra walked into the rear bedroom. Ex. D (Sharma Dep.) at 55:19-23.

**RESPONSE:** Undisputed.

41.      The bedroom lights were on and Cassandra turned them off to try and hide a bag of marijuana that was on the bedroom floor. Ex. C (Cassandra Dep.) at 88:8-16.

**RESPONSE:** Incomplete. Cassandra also testified that the possession of this marijuana was lawful at the time. Pl.Ex. 1 at 88:8–20.

42.     Cassandra was handcuffed in the rear bedroom by Detective Sharma with assistance from Sergeant Martin. Ex. D (Sharma Dep.) at 55:8-10; 55:25; 56:2-8.

**RESPONSE:** Undisputed.

43.     Cassandra would not place her hands behind her back when Detective Sharma was attempting to handcuff her. Ex. D (Sharma Dep.) at 56:13-17.

**RESPONSE:** Disputed. Cassandra testified that Sharma claimed she was "pulling him all over the apartment," but that she was not. Pl.Ex. 1 at 88:4–7. While she was already cuffed while inside the bedroom, Sharma intentionally overtightened her cuffs in response to Cassandra's protestations about the entry and her arrest, and that the officers repeatedly yanked on her wrists despite her complaints of pain. *Id*. at 89:5–91:4.

44.     Sergeant Martin grabbed ahold of Cassandra to assist in handcuffing her; Detective Sharma placed a handcuff on her right wrist, but Detective Sharma was unable to get ahold of Cassandra's left wrist so Sergeant Martin grabbed her left arm until Cassandra's left wrist was handcuffed. Ex. D (Sharma Dep.) at 56:18-25.

**RESPONSE:** Disputed. Martin never testified to these facts; he instead claimed to have effectuated Cassandra's arrest at the threshold of the apartment, which he did not. Pl.Ex. 5 at 50:3–9. Nor is there any evidence of this alleged struggle on the body-worn camera footage. Pl.Ex. 13 at 20:36:34–37:34. Sharma specifically stated that he was able to restrain Cassandra. Pl.Ex. 4 at 62:22–24. Sharma intentionally overtightened Cassandra's cuffs in response to her protestations about the entry and her arrest, and that the officers repeatedly yanked on her wrists despite her complaints of pain. Pl.Ex. 1 at 89:5–91:4.

45.     While in the apartment, Cassandra mentioned or complained about the handcuffs to Detective Sharma. Ex. D (Sharma Dep.) at 61:10-21.

**RESPONSE:** Undisputed that Cassandra complained about the cuffs, which is captured on the body-worn camera footage, and she testified to the same. Pl.Ex. 1 at 89:5–91:4; Pl.Ex. 17 at 20:48:26–45. The officers knew that overtightening Cassandra's cuffs could lead to injury, because they were trained in the "pinky test." Pl.Ex. 3 at 70:20–73:3.

46.     During the time that Cassandra was handcuffed, Detective Sharma held onto her arm and she pulled him around the apartment, while being very angry and irate. Ex. D (Sharma Dep.) at 62:4-21; 63:6-21; 64:4.

**RESPONSE:** Disputed. Cassandra testified that Sharma claimed she was dragging him, but she was not. There is no evidence of Sharma's claims on his body-worn camera footage. While it is undisputed that Cassandra was justifiably upset about the officers' unlawful entry and presence inside of her home, which she lawfully and verbally protested throughout the entire interaction, Sharma's subjective opinion that Cassandra was "angry and irate" has no bearing on the lawfulness of entry or arrest of which she was complaining, and does not provide a lawful basis to overtighten her cuffs. Sharma also testified that he doesn't know anyone that's happy for [sic] being arrested." Pl.Ex. 1 at 88:4–7; Pl.Ex. 4 at 63:25–64:10; Pl.Ex. 13 at 20:36:34–37:34.

47.     While Cassandra was pulling Detective Sharma forward, she appeared very angry and irate to Detective Sharma. Ex. D (Sharma Dep.) at 62:4-21; 63:6-21; 64:4

**RESPONSE:** Disputed. Cassandra testified that Sharma claimed she was dragging him, but she was not. There is no evidence of Sharma's claims on his body-worn camera footage. While it is undisputed that Cassandra was extremely upset about the officers' unlawful entry and presence inside of her home, which she lawfully and verbally protested throughout the entire interaction, Sharma's subjective opinion that Cassandra was "angry and irate" has no bearing on the lawfulness of entry or arrest of which she was complaining, and does not provide a lawful basis to overtighten

her cuffs. Sharma also testified that he doesn't know anyone that's happy for [sic] being arrested." Pl.Ex. 1 at 88:4–7; Pl.Ex. 4 at 63:25–64:10; Pl.Ex. 13 at 20:36:34–37:34.

48.     Because of Cassandra's behavior, Detective Sharma did not believe that it would be safe to loosen the handcuffs. Ex. D (Sharma Dep.) at 62:4-21; 63:6-21; 64:4.

**RESPONSE:** Disputed. Cassandra testified that Sharma claimed she was dragging him, but she was not. There is no evidence of Sharma's claims on his body-worn camera footage. While it is undisputed that Cassandra was extremely upset about the officers' unlawful entry and presence inside of her home, which she lawfully and verbally protested throughout the entire interaction, Sharma's subjective opinion that Cassandra was "angry and irate" has no bearing on the lawfulness of entry or arrest of which she was complaining, and does not provide a lawful basis to overtighten her cuffs. Sharma also testified that he doesn't know anyone that's happy for [sic] being arrested," and did not explain why or how loosening Cassandra's cuffs would somehow endanger anyone at the scene. Pl.Ex. 1 at 88:4–7; Pl.Ex. 4 at 63:6–64:10; Pl.Ex. 13 at 20:36:34–37:34.

49.     While inside the apartment on February 7, 2019, Sergeant Priore observed mail, or other certain documents, that listed Ms. Miller-Griffith as living at the residence. Ex. E (Priore Dep.) at 47:17-24.

**RESPONSE:** Incomplete. After Cassandra and Edd were removed from the Residence, Priore and Sharma went through each room of the apartment, picked up various items, and made verbal note of several things which were later included in the February 8, 2019 search warrant application. These discoveries were part of the first unlawful search. Pl.Ex. 15; Pl. Ex. 16; Pl.Ex. 23.

50.     Sergeant Priore also observed marijuana on the kitchen table and inside the bedroom. Ex. E (Priore Dep.) at 66:2-19.

**RESPONSE:** Incomplete. After Cassandra and Edd were removed from the Residence, Priore and Sharma went through each room of the apartment, picked up various items, and made verbal note of several things which were later included in the February 8, 2019 search warrant application. These discoveries were part of the first unlawful search, captured on body-worn camera footage, which shows Sharma describing the small quantity of marijuana and a grinder on the bed, as well as a grinder and scale on top of the television. Neither officer describes seeing any weapon or illegal contraband. Pl.Ex. 15; Pl. Ex. 16; Pl.Ex. 23.

51.     While inside the apartment on February 7, 2019, Detective Martin observed marijuana on the bed in the bedroom. Ex. F (Martin Dep.) at 56:2-23.

**RESPONSE:** Incomplete. After Cassandra and Edd were removed from the Residence, Priore and Sharma went through each room of the apartment, picked up various items, and made verbal note of several things which were later included in the February 8, 2019 search warrant application. These discoveries were part of the first unlawful search, captured on body-worn camera footage, which shows Sharma describing the small quantity of marijuana and a grinder on the bed, as well as a grinder and scale on top of the television, and Martin observing the same. No officer describes seeing any weapon or illegal contraband. Pl.Ex. 15; Pl. Ex. 16; Pl.Ex. 23.

52.     Defendants did not search the apartment prior to securing a search warrant. Ex. E (Priore Dep.) at 44:18-21; Ex. D (Sharma Dep.) at 65:16-25; Ex. F (Martin Dep.) at 54:25; 55:2-5; 61:16.

**RESPONSE:** Disputed. Cassandra testified that, while she was still inside the apartment, officers were going through the bathroom and other rooms of the home, which is captured on the body worn camera footage. Pl.Ex. 1 at 89:2–6; Pl.Ex. 12–13. After Cassandra and Edd were removed from the Residence, Priore and Sharma went through each room of the apartment, picked

15

up various items, and made verbal note of several things which were later included in the February 8, 2019 search warrant application. These discoveries were part of the first unlawful search, captured on body-worn camera footage, in which no officer describes seeing any weapon or illegal contraband. Pl.Ex. 15; Pl. Ex. 16; Pl.Ex. 23. The Residence was "frozen" while a search warrant was obtained, with officers coming in and out of the unlocked residence between the time of this entry until a search warrant was obtained and executed the following evening at approximately 5:00 p.m. on February 8, 2019. Pl.Ex. 3 at 83:22–85:8; Pl.Ex. 6 at 3. During this "freeze," none of the officers who remained at the Residence recorded their actions by turning on their body-worn cameras.

53.     Detective Sharma did not open any drawers or cabinets or search the residence on February 7, 2019. Ex. D (Sharma Dep.) at 65:16-22.

**RESPONSE:** Disputed. Priore and Sharma went through each room of the apartment, picked up various items, and made verbal note of several things which were later included in the February 8, 2019 search warrant application. The body worn camera footage shows the officers refiling through Plaintiffs' apartment prior to obtaining a warrant. Pl.Ex. 15; Pl. Ex. 16.

54.     After Edd was escorted outside the apartment, a show up identification procedure was conducted, and Ms. Miller-Griffith positively identified him. Ex. D (Sharma Dep.) at 94:24-25; 95:2-6; Ex. E (Priore Dep.) at 82:11-16.

**RESPONSE:** Undisputed.

55.     After plaintiffs were escorted out of the apartment, it was frozen pending a search warrant application, during which time an NYPD officer stood outside of the apartment. Ex. E (Priore Dep.) at 53:17-24; 54:17-20.

**RESPONSE:** Disputed. Priore testified he does not know who was stationed outside the Residence during the freeze, and was not present himself; he therefore has no firsthand knowledge as to the behavior of the officers on the scene or whether or not they entered the apartment after he left the scene. Pl.Ex. 3 at 53:17–54:12, 83:9–85:17; Pl.Ex. 5 at 58:21–23, 60:14–18; Pl.Ex. 6 at 3. He also incorrectly testified that no officer entered the apartment after Plaintiffs were removed, but we know from the body-worn camera footage that Priore himself, along with Sharma, reentered the apartment to search it, outside the presence of Plaintiffs. *Compare* Pl.Ex. 3 at 53:17–54:12 *with* Pl.Ex. 15–16. Moreover, no body-worn camera footage from the freeze was produced to Plaintiffs, raising further questions about the officers' behavior off camera.

56.      After plaintiffs were escorted out of the apartment, Sergeant Priore had no further involvement with them. Ex. E (Priore Dep.) at 55:5-16.

**RESPONSE:** Undisputed.

57.      While plaintiffs were at the police precinct, Detective Sharma does not believe that he interacted with them, saw them, or spoke with them. Ex. D (Sharma Dep.) at 92:6-25; 93:2-6.

**RESPONSE:** Undisputed.

58.      A search warrant for the apartment was obtained and executed on February 8, 2019. Ex. E (Priore Dep.) at 93:11-20; 94:7-16.

**RESPONSE:** Incomplete. When making the warrant application, Sharma swore in the that he was informed by Miller-Griffith that she observed a "black pistol" at the Residence on February 5, and that she had also observed the same firearm on prior occasions. This was the first instance that the officers claimed Miller-Griffith saw the alleged firearm on more than one occasion; the allegation was not contained in the DV or any other police report. Pl.Ex. 21 at 2; Pl.Ex. 23 at 4, ¶9. Sharma also swore in the application that he and other NYPD officers went the Residence on

February 7 and knocked on the door; that Cassandra stepped outside and Sharma informed her she was under arrest; and that, in response, Cassandra "ran into the Subject Location and tried to lock its door behind her," which was a lie. Pl.Ex. 20 at 4; Pl.Ex. 12 at 20:35:40–37:30. Sharma did not include any details about the 15 minute conversation between Cassandra and the officers in the hallway, nor did he include the fact that Cassandra explicitly denied the officers entry into the Residence at least a dozen times prior to their forced entry. Pl.Ex. 12 at 20:35:40–37:30; Pl.Ex. 22 at 3–5. Sharma swore in the application that he observed "empty ziplock bags, a smoked marihuana cigarette . . . a marihuana grinder and digital scales." He further stated that in his experience, these items are "paraphernalia used to sell and traffic in marihuana." But the body-worn camera footage shows only a single scale, two small grinders, and one small zip lock of marijuana, items consistent with personal use. Pl.Ex. 22 at 4, ¶19. He also lied by stating that no person searched the apartment prior to the warrant application. *Id.* at 5, ¶ 21. Moreover, ADA Kaftal testified that he would not have prepared the warrant if he believed that the information provided was obtained by a prior search made in violation of the Fourth Amendment. Pl.Ex. 22 at 2, ¶6. When the Court asked Sharma, while he was under oath, if he entered the Residence on February 7 "for the purpose of finding contraband," Sharma responded, "No, Your Honor." The Court followed up that it "want[ed] to make sure" the officers did not enter for that purpose. Pl.Ex. 23 at 2:1–13, 4:2–6. Immediately after Sharma told the Court that they did not enter to find contraband, Justice Dowling stated that she would grant the warrant application, and then did so. Pl.Ex. 22 at 5; Pl.Ex. 23 at 4:5–16.

59.     Between the time that Sergeant Martin left the apartment on February 7, 2019, and the search warrant being executed on February 8, 2019, Sergeant Martin had a conversation with

the District Attorney's Office about obtaining a search warrant and discussed the circumstances of what occurred as well as his observations. Ex. F (Martin Dep.) at 62:22-25; 63:2-24.

**RESPONSE:** Disputed. There is no evidence outside of Martin's testimony suggesting that he spoke with the District Attorney's Office about the warrant. Instead, around 8:30 a.m. on February 8, 2019, while the Alexanders remained in custody, Sharma and Priore went to the Brooklyn DA's Office to draw up a search warrant for the Residence with the assistance of ADA Robert Kaftal. Pl.Ex. 3 at 85:18–86:17, 90:4–94:24; Pl.Ex. 6 at 3; Pl.Ex. 7 at 3; Pl.Ex. 20.

60.     Sergeant Martin also informed the district attorney that the officers wore body worn cameras. Ex. F (Martin Dep.) at 64:19-23.

**RESPONSE:** Disputed. There is no evidence outside of Martin's testimony suggesting that he spoke with the District Attorney's Office about the warrant. Instead, around 8:30 a.m. on February 8, 2019, while the Alexanders remained in custody, Sharma and Priore went to the Brooklyn DA's Office to draw up a search warrant for the Residence with the assistance of ADA Robert Kaftal. Pl.Ex. 3 at 85:18–86:17, 90:4–94:24; Pl.Ex. 6 at 3; Pl.Ex. 7 at 3; Pl.Ex. 20.

61.     On February 8, 2019, Sergeant Priore and Detective Sharma went to the District Attorney's Office so that the prosecutor could draft a search warrant. Ex. E (Priore Dep.) at 90:17-23.

**RESPONSE:** Undisputed.

62.     Detective Sharma spoke with the Assistant District Attorney ("ADA") regarding the case, investigation, and why he believed a search warrant was necessary. Ex. E (Priore Dep.) at 92:8-21.

**RESPONSE:** Undisputed.

63.     Sergeant Priore was not present during the entire time when Detective Sharma spoke with the DA, but Sergeant Priore did not hear Detective Sharma say anything that he believed was inaccurate. Ex. E (Priore Dep.) at 90:24-25; 91:2-11; 91:18-21; 92:22-25.

**RESPONSE:** Disputed that, if Sharma overheard anything Priore told the ADA, he would have known that the facts were incomplete and inaccurate, including the details described in response to No. 58 above.

64.     Detective Sharma signed the search warrant affidavit after it was drafted by the ADA. Ex. D (Sharma Dep.) at 89:25; 90:2-4.

**RESPONSE:** Undisputed.

65.     The affidavit included information that was provided by Ms. Miller-Griffith as well as information based on Detective Sharma's own observations. Ex. D (Sharma Dep.) at 90:5-13.

**RESPONSE:** Incomplete. When making the warrant application, Sharma swore in the that he was informed by Miller-Griffith that she observed a "black pistol" at the Residence on February 5, and that she had also observed the same firearm on prior occasions. This was the first instance that the officers claimed Miller-Griffith saw the alleged firearm on more than one occasion; the allegation was not contained in the DV or any other police report. Pl.Ex. 21 at 2; Pl.Ex. 23 at 4, ¶9. Sharma also swore in the application that he and other NYPD officers went the Residence on February 7 and knocked on the door; that Cassandra stepped outside and Sharma informed her she was under arrest; and that, in response, Cassandra "ran into the Subject Location and tried to lock its door behind her," which was a lie. Pl.Ex. 20 at 4; Pl.Ex. 12 at 20:35:40–37:30. Sharma did not include any details about the 15 minute conversation between Cassandra and the officers in the hallway, nor did he include the fact that Cassandra explicitly denied the officers entry into the Residence at least a dozen times prior to their forced entry. Pl.Ex. 12 at 20:35:40–37:30; Pl.Ex. 22

at 3–5. Sharma swore in the application that he observed "empty ziplock bags, a smoked marihuana cigarette . . . a marihuana grinder and digital scales." He further stated that in his experience, these items are "paraphernalia used to sell and traffic in marihuana." But the body-worn camera footage shows only a single scale, two small grinders, and one small zip lock of marijuana, items consistent with personal use. Pl.Ex. 22 at 4, ¶19. He also lied by stating that no person searched the apartment prior to the warrant application. *Id.* at 5, ¶ 21. Moreover, ADA Kaftal testified that he would not have prepared the warrant if he believed that the information provided was obtained by a prior search made in violation of the Fourth Amendment. Pl.Ex. 22 at 2, ¶6. When the Court asked Sharma, while he was under oath, if he entered the Residence on February 7 "for the purpose of finding contraband," Sharma responded, "No, Your Honor." The Court followed up that it "want[ed] to make sure" the officers did not enter for that purpose. Pl.Ex. 23 at 2:1–13, 4:2–6. Immediately after Sharma told the Court that they did not enter to find contraband, Justice Dowling stated that she would grant the warrant application, and then did so. Pl.Ex. 22 at 5; Pl.Ex. 23 at 4:5–16.

66.      Detective Sharma briefly reviewed the warrant affidavit prior to signing it and believed that contents were accurate. Ex. D (Sharma Dep.) at 97:2-9.

**RESPONSE:** Disputed that Sharma believed the contents of the affidavit were accurate. He was well aware of the fabrications and omissions present in the warrant application, as described in response to No. 65 above. Moreover, ADA Kaftal would not have prepared the affidavit if he believed it was false or had material omissions of fact. Pl.Ex. 22 at 2.

67.      If Detective Sharma had noticed something in the warrant affidavit that was inaccurate, he would have brought that to the District Attorney's attention. Ex. D (Sharma Dep.) at 97:10-14.

**RESPONSE:** Disputed that Sharma believed the contents of the affidavit were accurate. He was well aware of the fabrications and omissions present in the warrant application, as described in response to No. 65 above. Moreover, ADA Kaftal would not have prepared the affidavit if he believed it was false or had material omissions of fact. Pl.Ex. 22 at 2.

68.     Detective Sharma did not hold the plaintiffs in custody while he obtained and executed the search warrant. Ex. D (Sharma Dep.) at 75:20-25; 76:2-3.

**RESPONSE:** Disputed. The NYPD's own paperwork clearly states that Plaintiffs' arraignment was delayed "due to ongoing investigation and awaiting the execution of the search warrant." Pl.Ex. 24 at 2 and 4.

69.     After the search warrant was executed, the apartment door was locked. Ex. D (Sharma Dep.) at 68:21-25; 69:2-24; Ex. E (Priore Dep.) at 65: 6-11.

**RESPONSE:** Disputed.

70.     Sergeant Priore did not see any property that was damaged during the search of the apartment on February 8, 2019. Ex. E (Priore Dep.) at 68:6-9.

**RESPONSE:** Disputed. The body-worn camera footage from the search shows the officers throwing Plaintiffs' belongings around without regard or concern. The officers flipped the bed over, moved furniture, and opened every drawer, cabinet, and door in the Residence, and threw everything they touched into the center ofs the bedroom. Plaintiffs testified to the state of the apartment upon their return, and photographs show the damage inflicted by the officers. Cassandra believed that the apartment was robbed based on its condition. Pl.Ex. 3 at 74:10–76:14; Pl.Ex. 18–20.

71.     During the search warrant execution, multiple items were recovered including an imitation pistol, a stun gun, a machete, a golf club, marijuana, scissors, empty baggies, and a metal

grinder. Ex. C (Cassandra Dep.) at 121:15-25; 122:19-22; 123:2-4; 123:22-25; Ex. F (Martin Dep.)

at 73:8-14.

**RESPONSE:** Undisputed.

### PLAINTIFFS' ADDITIONAL UNDISPUTED MATERIAL FACTS
### PURSUANT TO LOCAL RULE 56.1

### THE OVERTIGHTENING OF CASSANDRA'S CUFFS

127.   After Cassandra was cuffed, Sharma clicked the cuffs tighter, causing pain and cuts to her skin. Pl. Ex. 1 at 86:3-18; 89:7-23.

**DEFENDANTS' RESPONSE: Disputed. Body worn camera footage shows that Officer Sharma was not tightening Cassandra Alexander's handcuffs. Instead, Officer Sharma was holding Cassandra Alexander's arm while she was attempting to pull away. See Def. Ex. K at 20:48:55-20:49:05. However, undisputed that Cassandra Alexander so testified. Further, defendants object on the basis that this statement consists of arguments and/or legal conclusions in violation of Local Civil Rule 56.1(b) and should be disregarded.**

128.   Martin exacerbated this pain by yanking on Cassandra's arms, pulling them up toward her shoulders, while holding onto the cuffs behind her back. Pl. Ex. 1 at 87:4-25; 90:17-91:4.

**DEFENDANTS' RESPONSE: Defendants object on the basis that this statement consists of arguments and/or legal conclusions in violation of Local Civil Rule 56.1(b) and should be disregarded. However, undisputed that Cassandra Alexander so testified.**

129.   Cassandra complained multiple times about the tightness of the cuffs on her wrists, including inside of the Residence, inside the patrol car, and at the precinct. Pl. Ex. 1 at 89:24-90:16; 91:17-92:16.

**DEFENDANTS' RESPONSE: Defendants object on the basis that this statement consists of arguments and/or legal conclusions in violation of Local Civil Rule 56.1(b) and should be disregarded. However, undisputed that Cassandra Alexander so testified.**

130.    After the arrest, Cassandra's wrists were "welt up" and the skin was broken. Her hands were swollen, but the majority of the pain, swelling, and bruising was to her wrists. It took approximately two weeks for these injuries to heal. Pl. Ex. 1 at 92:23-93:9; 143:17-21.

**DEFENDANTS' RESPONSE: Defendants object on the basis that this statement consists of arguments and/or legal conclusions in violation of Local Civil Rule 56.1(b) and should be disregarded. However, undisputed that Cassandra Alexander so testified.**

**THE PROLONGED PROSECUTION OF PLAINTIFFS**

131.    Cassandra recalls going to court 1–2 times a month for approximately eight months, amounting 15 appearances total. Pl. Ex. 1 at 115:20-116:5.

**DEFENDANTS' RESPONSE: Defendants object on the basis that the statement does not set forth facts that are material to the resolution of defendants' motion for summary judgment, and is therefore in violation of Local Civil Rule 56.1(b) and should be disregarded.  However, undisputed that Cassandra Alexander so testified.**

132.    Cassandra was required to appear in court for her arraignment on February 9, 2019. There were several additional court appearances related to the prosecution, including: March 11, March 20, May 7, June 5, June 18, July 29, July 30, September 9, September 12, October 2, October 11, November 8, and November 19, when she accepted an adjournment in contemplation of dismissal. Pl. Ex. 24 at 3; Pl. Ex. 27-29; Pl. Ex. 38; Pl. Ex. 39 at 2-4.

**DEFENDANTS' RESPONSE: Defendants object on the basis that the statement does not set forth facts that are material to the resolution of defendants' motion for summary judgment, and is therefore in violation of Local Civil Rule 56.1(b) and should be disregarded.**

133.    Edd recalls going to court approximately 8 to 9 times for the prosecution. Pl. Ex. 2 at 70:20-73:18.

**DEFENDANTS' RESPONSE:** **Defendants object on the basis that the statement does not set forth facts that are material to the resolution of defendants' motion for summary judgment, and is therefore in violation of Local Civil Rule 56.1(b) and should be disregarded.  However, undisputed that Edd Alexander so testified.**

134.    Edd appeared in court for his arraignment on February 9, 2019. There were several additional court appearances related to the prosecution, including: May 8, June 18, July 30, September 9, October 2, and November 7, when all charges against him were dismissed. Pl. Ex. 24 at 1; Pl. Ex. 30; Pl. Ex. 31-32; Pl. Ex. 40.

**DEFENDANTS' RESPONSE:** **Defendants object on the basis that the statement does not set forth facts that are material to the resolution of defendants' motion for summary judgment, and is therefore in violation of Local Civil Rule 56.1(b) and should be disregarded.**

Dated:      New York, New York
            April 10, 2023

                                        HON. SYLVIA O. HINDS-RADIX
                                        Corporation Counsel - City of New York
                                        *Attorney for Defendants*
                                        100 Church Street
                                        New York, New York 10007
                                        (212) 356-2373


                                By:     /s/ *Andrea Osgood*
                                        ANDREA OSGOOD
                                        *Senior Counsel*
                                        New York City Law Department